UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
J.S.,

                Plaintiff,

      - against -             **MEMORANDUM AND ORDER**

STEPHEN T'KACH, Director of the Office of      11 Civ. 103 (NRB)
Enforcement Operations (OEO), in his
Individual Capacity; JOE NORWOOD, Regional
Director, Northeast Region, Federal Bureau
of Prisons, in his Individual Capacity;
JANICE M. KILLIAN, Warden at F.C.I.
Otisville, Otisville, N.Y., in her
Individual Capacity; ANDREW DACHISEN,
Associate Warden at F.C.I. Otisville,
Otisville, N.Y., in his Individual
Capacity; FRANK LARA, Associate Warden at
F.C.I. Otisville, Otisville, N.Y., in his
Individual Capacity; DONNA HILL, Unit
Manager at F.C.I. Otisville, Otisville,
N.Y., in her Individual Capacity; LOUIS
SCIALABBA, Counselor at F.C.I. Otisville,
Otisville, N.Y., in his Individual
Capacity; GREG SALITIS, Counselor at F.C.I.
Otisville, Otisville, N.Y., in his
Individual Capacity; TERESA WELCH,
Counselor at F.C.I. Otisville, Otisville,
N.Y., in her Individual Capacity; John Doe
No. 1, Segregation Review Official at
F.C.I. Otisville, Otisville, N.Y., in his
Individual Capacity; BRIAN KESSLER, Guard
at F.C.I. Otisville, Otisville, N.Y., in
his Individual Capacity; THOMAS FROST,
Guard at F.C.I. Otisville, Otisville, N.Y.,
in his Individual Capacity; KEVIN
SCHRIEBER, Guard at F.C.I. Otisville,
Otisville, N.Y., in his Individual
Capacity; DUDLEY J. TERRELL, Warden at
M.D.C., Brooklyn, N.Y., in his Individual
Capacity; John Doe No. 2, Assistant Warden
at M.D.C., Brooklyn, N.Y., in his
Individual Capacity; John Doe No. 3,
Segregation Review Official at M.D.C.,
Brooklyn, N.Y., in his Individual Capacity;

John Doe No. 4, Unit Manager at M.D.C.,
Brooklyn, N.Y., in his Individual Capacity;
John Doe No. 5, Counselor at M.D.C.,
Brooklyn, N.Y., in his Individual Capacity;
John Doe Nos. 6-21, Guards at M.D.C.,
Brooklyn, N.Y., in their Individual
Capacities,

                    Defendants.

-------------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff J.S. ("plaintiff"), a prisoner currently incarcerated at the Federal Correctional Institution ("FCI") in Forrest City, Arkansas, brings this action pursuant to <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971), against thirteen named current or former employees of the Federal Bureau of Prisons ("BOP") as well as twenty-one "John Doe" employees.[1] Plaintiff alleges that these individuals violated his Fifth Amendment rights by placing him in the Segregated Housing Unit ("SHU") of the FCI in Otisville, New York for 115 days and the Metropolitan Detention Center ("MDC") in Brooklyn, New York for 91 days without due process, and violated his Eighth Amendment rights by subjecting him to cruel and unusual punishment and failing to protect him from threats to his safety.

---

[1] Plaintiff has agreed to voluntarily dismiss his claims against defendants Stephen T'Kach and Joe Norwood. <u>See</u> Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Pl. Opp.") at 13, n.5.

Presently before the Court is a motion to dismiss the Second Amended Complaint ("SAC") by the thirteen named defendants (the "defendants").  The defendants move to dismiss on three grounds: first, that plaintiff failed to exhaust his administrative remedies; second, that the SAC does not adequately plead the personal involvement of the defendants; and third, that plaintiff's allegations regarding the conditions of his confinement and the defendants' failure to protect him fail to state a claim under the Eighth Amendment.

Because exhaustion is an affirmative defense, rather than a jurisdictional requirement, see Richardson v. Goord, 347 F.3d 431, 434 (2d. Cir. 2003), a complaint may only be dismissed under Rule 12(b)(6) for failure to exhaust "if nonexhaustion is clear from the face of the complaint."  McCoy v. Goord, 255 F. Supp. 2d 233, 251 (S.D.N.Y. 2003).  If not, "a defendant's motion to dismiss should be converted to one for summary judgment . . . for the narrow purpose of determining whether the plaintiff exhausted his administrative remedies." Page v. Breslin, No. 02-CV-6030 (SJF)(LB), 2004 U.S. Dist. LEXIS 25056, at *5 (E.D.N.Y. Nov. 29, 2004).  Here, the SAC does not reveal whether plaintiff exhausted his administrative remedies. However, the parties submitted affidavits regarding this issue and the defendants submitted plaintiff's administrative request records.  To allow the Court to consider these materials and

properly address the issue of exhaustion, the parties agreed to convert the motion to dismiss to one for summary judgment on the limited question of whether plaintiff exhausted his administrative remedies. Accordingly, we analyze the defendants' exhaustion defense under the motion for summary judgment standard and their other defenses under the motion to dismiss standard.

For the reasons set forth below, we grant the motion for summary judgment on the Eighth Amendment claims and grant the motion to dismiss the Fifth Amendment claims.

<u>BACKGROUND</u>[2]

**I.   Termination from the Witness Security Program**

On December 7, 2007, plaintiff was incarcerated at FCI Otisville and housed as a member of the Witness Security Program ("WSP") in exchange for his testimony against members of a criminal gang known as the Texas Syndicate. SAC ¶ 32. On March 11, 2010, plaintiff was notified that he was being terminated from the WSP for violating the Office of Enforcement Operations Witness Security Program Prisoner-Witness Agreement. <u>Id.</u> ¶ 33. On April 19, 2010, after his appeal of the termination was denied, he was removed from the Witness

---

[2] While the following facts are derived primarily from the SAC, we also cite to plaintiff's Declaration in Support of his Opposition to Defendants' Motion to Dismiss the Complaint ("Pl. Decl."), the Declaration of Adam Johnson, a Supervisory Attorney at the Metropolitan Correctional Center in New York ("Johnson Decl."), and the exhibits annexed to the Declaration of Adam Johnson.

Security unit and placed in the SHU at FCI Otisville.  <u>Id.</u> ¶¶ 35, 36.

## II.  **Confinement in the FCI Otisville SHU**

Plaintiff was held in the SHU for approximately 115 days.[3] <u>Id.</u> ¶ 86.  During that time, he alleges that he had regular meetings with defendant Theresa Welch, a prison counselor, and asked her on at least three and as many as five occasions why he was in the SHU and when he would be released.  <u>Id.</u> ¶ 75; Pl. Decl. ¶¶ 2, 3.  On each occasion, he allegedly asked Welch for the necessary grievance forms to protest his continued confinement in the SHU and Welch denied his requests, telling him that it was not necessary for him to file a grievance because he was going to be released from the SHU soon.[4]  Pl. Decl. ¶¶ 4, 5.

While in the SHU, plaintiff rotated every 21 days between two cells measuring 6 feet by 9 feet, which is smaller than the cells used by the general prison population.  SAC ¶¶ 44, 48. The SHU cells contained a sink, which intermittently lacked hot water, a toilet, and a concrete platform on which a torn,

---

[3] The SAC is internally inconsistent on this point.  On the one hand, it alleges that plaintiff spent 115 days in the FCI Otisville SHU, while on the other hand it alleges that he was held there from approximately April 19, 2010 until July 28, 2010, which is 101 days.  <u>Id.</u> ¶¶ 37, 86.  Because our holding does not depend on whether plaintiff was confined in the SHU for 101 or 115 days, we give plaintiff the benefit of the inconsistency and assume for present purposes that he did in fact spend 115 days in the SHU.

[4] Notably, on June 25, 2010, while plaintiff was still in the FCI Otisville SHU, he filed a formal grievance alleging inadequate access to the law library.  Johnson Decl. ¶ 13 and Ex. 1.  However, he later withdrew the grievance.  <u>Id.</u>

three-inch thick mattress lay with blankets but no pillows.
Id. ¶¶ 45, 46.   The mattress and blankets emitted a foul odor.
Id. ¶ 46.   Plaintiff was kept alone in his cell for 22 hours a
day, and was only allowed out for one hour of exercise in a
caged area and one hour in the library.   Id. ¶¶ 59, 67.
However, on weekends and one four-day stretch, he was not
allowed to leave his cell at all.   Id. ¶¶ 61-63.   When he was
taken out of his cell, he was handcuffed behind his back.   Id.
¶ 66.   Plaintiff's extended confinement and limited activity
caused him severe leg pain.   Id. ¶ 64.

One of plaintiff's cells was located across the hall from
the showers, and three days a week, when inmates used those
showers, his cell flooded with two inches of water.   Id. ¶ 50.
Although prison guards gave plaintiff blankets to soak up the
water, the flooding conditions could last up to five hours if
blankets were not provided right away.   Id.   In addition to the
flooding conditions, the lights in his cells were routinely
left on at night, and were once left on for four days in a row.
Id. ¶ 55.   This prevented plaintiff from falling asleep.   Id.
Also, the windows in plaintiff's cells did not function
properly and were kept open at all times, which exposed him to
uncomfortable temperatures and weather conditions.   Id. ¶ 58.

Plaintiff had little contact with others while in the SHU.
Indeed, he was limited to 15 minutes of phone time every 30

days, was not permitted to see his family, was prohibited from participating in any programs available to the general prison population, and did not meet with any medical professionals to evaluate his mental health.  Id. ¶¶ 69-72.

The limited interactions he had with others at times put him in fear for his safety.  For example, one of the prison guards, defendant Brian Kessler, threatened to beat up any inmate who came from the WSP, and on one occasion said, "I will open your door and kick your ass you f-ing rat!"  Id. ¶ 73. Inmates who learned of plaintiff's involvement in the WSP threatened him on multiple occasions, cursed at him, and called him a "rat."  Id. ¶ 79.  Finally, his former counselors in the WSP –- defendants Welch, Donna Hill, Louis Scialabba, and Greg Salitis –- continued to meet with him while he was in the SHU, which signaled to other inmates that he had cooperated with law enforcement.  Id. ¶ 75.

## III. Confinement in the MDC Brooklyn SHU

On or about July 28, 2010, plaintiff was transferred to the MDC in Brooklyn and immediately placed in the SHU.  Id. ¶ 85.  When he arrived, he was told by a prison official that he was being held in the SHU because he had come from the WSP. Id. ¶ 119.  Plaintiff remained in the SHU for approximately 91

days, until October 27, 2010, at which point he was moved to the general population.[5]  Id. ¶¶ 89, 121, 123.

The conditions in the MDC Brooklyn SHU were similar in several respects to the conditions he experienced in the FCI Otisville SHU.  Plaintiff rotated between several cells, each measuring 6 feet by 9 feet.  Id. ¶ 96.  He was confined to his cell for 22 hours each day, being permitted a maximum of one hour of exercise time and one hour of library time.  Id. ¶ 100. However, despite requesting access to the law library nearly every day, he was denied access on all but three or four occasions.  Id. ¶ 101.  Moreover, he was only allowed exercise time three to five days per week.  Id. ¶ 102.  In fact, plaintiff was once confined in his cell alone for four days straight.  Id. ¶ 106.  The forced inactivity continued to cause plaintiff leg pain.  Id. ¶ 107.  When plaintiff was allowed out of his cell, he, like all SHU inmates, was handcuffed behind his back.  Id. ¶ 110.

As in Otisville, plaintiff had limited contact with others: he was allowed 15 minutes of phone time every 30 days; he was not permitted to see family members; he could not participate in the programs that were available to prisoners in general population; and he was not evaluated by medical or

---

[5] On November 15, 2010, plaintiff was transferred to the Federal Transfer Center in Oklahoma City, and two days later, on November 17, he was finally transferred to the FCI in Forest City, Arkansas.  Id. ¶ 85.

mental health professionals.  Id. ¶¶ 113-116.  However, unlike in Otisville, plaintiff shared most of his cells with another inmate.  Id. ¶¶ 97, 98.  Although this reduced the solitary nature of his confinement, it made the living conditions more cramped and led to an incident in which his cellmate, who discovered that plaintiff had been in the WSP, threatened plaintiff and yelled that he did not want to share a cell with him.  Id. ¶ 109.

Critically for present purposes, plaintiff filed three grievance forms while incarcerated in the MDC Brooklyn SHU.[6] First, on August 16, 2010, on a form entitled, "Inmate Request for Informal Resolution" -- known as a BP-8 -- he complained about the law library.  Johnson Decl. ¶ 14 and Ex. 6. Specifically, he wrote: "The law library is inadequate and is [sic] denial of access to courts [sic] I need law library time, more than once a week [sic]."  Johnson Decl. Ex. 6.  Plaintiff received a response on August 28, 2010 stating: "Law library use for inmates in SHU should be done via SHU staff.  The library staff does not schedule law library time for SHU inmates."  Id.

On September 24, 2010, after his request for informal resolution failed to produce the desired results, plaintiff

---

[6]  In addition to the four grievance forms plaintiff filed during his confinement in the SHU at FCI Otisville and MDC Brooklyn, he filed nine others between 2009 and 2013.  Johnson Decl. ¶ 11 and Ex. 1.

took the next step in the administrative remedy process by filing a "Request for Administrative Remedy" form, also known as a BP-9.  Johnson Decl. ¶¶ 8, 14 and Ex. 7.  On it, he wrote: "I am being denied access to courts (no computer access, inadequate books)."  Johnson Decl. Ex. 7.  The warden, defendant Dudley Terrell, provided a thoughtful, five-paragraph response on October 7, 2010.  Johnson Decl. ¶ 14 and Ex. 8.  In the response, Terrell furnished plaintiff with a list of legal reference materials the BOP strove to offer inmates, noted that plaintiff could request books not maintained in the SHU law library, and informed plaintiff that the prison was in the process of installing computers in the SHU law library.  Id. Terrell further informed plaintiff that he could appeal to the BOP Regional Director –- via form BP-10 -- within 20 days if he was dissatisfied with the response.[7]  Id.

Finally, plaintiff filed a second BP-9, also on September 24, 2010.  It read:

> I am being discriminated against.  I have not broken any rules to be put in the SHU. I have [sic] entitled to get everything the other inmates get, such as, [sic] TV, access to law computer [sic], personal phone calls, [sic] full commissary list. (My BP-8 was never returned.  Lt. Gonzalez and Mr. Martinez told me to go ahead and send in the BP-9.)

---

[7] If plaintiff appealed and was then dissatisfied with the Regional Director's response, the fourth and final step in the administrative remedy process would be to submit an appeal to the Office of the General Counsel by completing a BP-11 form.  Johnson Decl. ¶ 8.

Johnson Decl. Ex. 9.

Terrell provided a response on October 14, 2010.  It began

with an explanation of why plaintiff was being held in the SHU:

> An inquiry of the matter reveals on July
> 28, 2010, you arrived at MDC Brooklyn as a
> holdover, for institution to institution
> transfer.  Subsequently, later the same day
> as a result of a Central Inmate Monitoring
> (CISM) concern you were transported to SHU
> and placed on Administrative Detention
> status.  Pursuant to Program Statement
> 5270.07, <u>Inmate Discipline and Special
> Housing Units</u>, administrative detention is
> a form of separation from the general
> population used when the continued presence
> of the inmate within the general population
> would pose a serious threat to life,
> property, self, staff, other inmates, or to
> the security and orderly running of the
> institution.  Additionally, Administrative
> Detention status may also include inmates
> who require protective custody or those who
> cannot be placed in local population
> because they are holdovers en route to
> another institution.
>
> Based upon the above referenced regulations
> and in accordance with sound correctional
> practices upon arrival to this facility it
> was determined your placement in SHU was
> warranted and appropriate.

Johnson Decl. Ex. 10 (emphasis in original).

The response then addressed plaintiff's demand for access

to the same amenities as those in the general population.  It

advised him that "in accordance with Program Statement 5270.07,

if consistent with available resources and the security needs

of the unit the Warden shall give an inmate housed in

Administrative Detention the same general privileges given to inmates in the general population." Id.  However, the discussion became moot as the next paragraph informed plaintiff that he would no longer be held in the SHU: "While housed in SHU your file was continuously monitored and reviewed. Accordingly, as of the writing of this response you have subsequently been transported from SHU to general population." Id.

Plaintiff was moved from the SHU to the general prison population on or about October 27, 2010, which was prior to the deadline for appealing the responses to his two BP-9 grievances.  SAC ¶ 123.  Because he was satisfied with this outcome, he did not appeal either response.  Pl. Decl. ¶ 11.

**IV.  Procedural History**

Plaintiff, proceeding pro se, filed his original complaint on December 30, 2010 against five federal employees.  In that complaint, he alleged that his termination from the WSP and subsequent placement in the SHU violated his Fifth and Eighth Amendment rights.  On February 9, 2011, the Court sua sponte dismissed the complaint, concluding that it lacked subject matter jurisdiction.  Plaintiff, through appointed pro bono counsel, appealed the decision.

On April 10, 2013, the Second Circuit affirmed the Court's dismissal of plaintiff's claim relating to his termination from

the WSP, but remanded the case to permit plaintiff to replead his claims relating to his SHU confinement.  Plaintiff filed an amended complaint on July 1, 2013 and the operative SAC on July 24, 2013.[8]

The defendants moved to dismiss the SAC on February 28, 2014.  Plaintiff filed his opposition on April 11, 2014, and the defendants submitted their reply on May 5, 2014.

<u>**DISCUSSION**</u>

**I.   Exhaustion**

The defendants' first argument in support of their motion to dismiss is that plaintiff failed to exhaust his administrative remedies.  As previously noted, in order to consider the materials the parties submitted on this issue, we converted, with the parties' consent, the defendants' motion to dismiss into one for summary judgment on the limited question of whether plaintiff's claims are barred by a failure to exhaust administrative remedies.

<u>A.   Summary Judgment Standard</u>

A motion for summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  In this context, "[a] fact is 'material' when

---

[8] Of the thirteen defendants named in the SAC, only three (Stephen T'Kach, Donna Hill, and Louis Scialabba) were named in the original complaint.

it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted).  "In assessing the record to determine whether there is [such] a genuine issue [of material fact] to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'"  F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where that burden is carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  Id. (citing Anderson, 477 U.S. at 249).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli

14

<u>Lilly and Co.</u>, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citations omitted).

### B.  The PLRA

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), states: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." "The exhaustion requirement applies to 'all prisoners seeking redress for any prison circumstances or occurrences,' whether it was a particular episode or an ongoing circumstance." <u>Leon v. City of New York</u>, No. 13 Civ. 5407 (CM), 2014 U.S. Dist. LEXIS 95724, at *7 (S.D.N.Y. July 10, 2014) (quoting <u>Porter v. Nussle</u>, 534 U.S. 516, 519 (2002)). Each claim must satisfy the exhaustion requirement, and "if a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad." <u>Jones v. Bock</u>, 549 U.S. 199, 221 (2007).

To appropriately exhaust administrative remedies, an inmate must follow a four-step grievance procedure -- utilizing forms BP-8, BP-9, BP-10, and BP-11 -- established by the BOP's Administrative Remedy Program. <u>See</u> 28 C.F.R. §§ 542.10-542.19. "The inmate may file an action in federal court only after these four steps have been completed." <u>Indelicato v. Suarez</u>,

207 F. Supp. 2d 216, 219 (S.D.N.Y. 2002). This rule is designed to "reduce the quantity and improve the quality of prisoner suits, and to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." Johnson v. Killian, 680 F.3d 234, 238 (2d Cir. 2012) (internal alterations and quotation marks omitted). To that end, grievances must "alert[] the prison to the nature of the wrong for which redress is sought" and "provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004) (internal quotation marks omitted).

An inmate's failure to exhaust his administrative remedies may be excused in certain situations. As the Second Circuit explained in Hemphill v. New York, 380 F.3d 680 (2d Cir. 2004), non-exhausted claims may survive if: (1) administrative remedies were not in fact available; (2) the defendants' actions inhibited exhaustion; or (3) "special circumstances" justified the inmate's failure to exhaust. Id. at 686.

### 1. Fifth Amendment Claims

Plaintiff alleges that the defendants violated his Fifth Amendment rights by confining him in the SHU at both FCI Otisville and MDC Brooklyn without due process of law. It is

undisputed that plaintiff did not complete the four-step administrative remedy process at either prison with respect to this claim. Indeed, at FCI Otisville, plaintiff filed a single grievance form (for inadequate access to the law library), which he withdrew, and at MDC Brooklyn, his grievance regarding his placement in the SHU proceeded only to the second step. However, as the defendants concede, plaintiff's declaration -- which states that at FCI Otisville, Welch repeatedly denied plaintiff's requests for grievance forms to challenge his placement in the SHU and assured him that he would be released from the SHU soon -- has created a material issue of fact regarding whether his failure to exhaust his administrative remedies at FCI Otisville was justified. See Defendants' Reply Brief ("Def. Reply Br.") at 1, n.1. Thus, the only question is whether there exists a similar issue of fact regarding the exhaustion of his administrative remedies at MDC Brooklyn.[9]

On September 24, 2010, while he was being held in the MDC Brooklyn SHU, plaintiff filed a BP-9 stating in relevant part:

---

[9] Although defendants' opening brief argues that "all of [plaintiff's] claims in the SAC must be dismissed for failure to exhaust administrative remedies," Def. Br. at 10, their reply brief does not advance this argument with respect to plaintiff's Fifth Amendment claim regarding MDC Brooklyn. In fact, in the conclusion paragraph of the reply brief, in which defendants list all of their reasons for seeking dismissal of plaintiff's claims with respect to each prison, they do not even mention nonexhaustion in the context of the Fifth Amendment allegations. See Def. Reply Br. at 15-16. However, because defendants have not conceded that a material issue of fact exists regarding plaintiff's failure to exhaust his administrative remedies at MDC Brooklyn regarding his Fifth Amendment claim, we must address this issue.

"I am being discriminated against.  I have not broken any rules to be put in the SHU."  Johnson Decl. Ex. 9.  On October 14, 2010, he received a response from Terrell, the prison warden, notifying him that his file had been reviewed and he was being transferred from the SHU to general population.  Johnson Decl. Ex. 10.  Because plaintiff obtained the result he wanted, he did not appeal to the BOP Regional Director, which would have been the next step in the administrative remedy process.  However, plaintiff did not have to appeal.  His receipt of a favorable outcome served to exhaust his grievance.  See Andrews v. Cruz, No. 04 Civ. 566 (PAC) (RLE), 2010 U.S. Dist. LEXIS 28124, at *16 (S.D.N.Y. Mar. 24, 2010) ("once favorable relief is obtained on a grievance, there is no further possibility of some relief for the prisoner, and exhaustion has occurred" (internal alterations, citation, and quotation marks omitted)).  Therefore, we find that plaintiff's Fifth Amendment claims are not barred by the PLRA's exhaustion requirement.

### 2.  Eighth Amendment Claims

Plaintiff alleges that the defendants violated his Eighth Amendment rights by subjecting him to cruel and unusual conditions of confinement at both FCI Otisville and MDC Brooklyn, and by failing to protect him from being exposed as a former WSP inmate.  At FCI Otisville, the only grievance plaintiff filed was about inadequate access to the law library,

which he subsequently withdrew.   Johnson Decl. ¶ 13 and Ex. 1.
Thus, there is no question that he failed to exhaust his
administrative remedies with respect to the alleged Eighth
Amendment violations at FCI Otisville.   The only question is
whether his failure to exhaust is excused by defendant Welch's
alleged refusal to provide him with grievance forms when he
protested his continued confinement in the SHU.   Because the
fact of his SHU confinement is a completely separate issue from
the conditions of his confinement, Welch's actions inhibiting
him from grieving the former do not excuse his failure to
grieve the latter.   Accordingly, plaintiff's Eighth Amendment
claims regarding FCI Otisville are barred by the PLRA's
exhaustion requirement.

    With respect to MDC Brooklyn, the exhaustion analysis is
different, but the result is essentially the same.   At that
facility, plaintiff filed two grievances: one concerned
inadequate access to the law library, books, and computers (see
Johnson Decl. Exs. 6, 7); the other concerned plaintiff's
placement in the SHU and the denial of amenities that general
population inmates enjoyed, "such as[] TV, access to law
computer, personal phone calls, [and a] full commissary list"
(see Johnson Decl. Ex. 9).   These grievances were effectively
exhausted when he ultimately received the relief he sought
(i.e., a transfer to general population in October 2010).

However, the grievances did not notify prison officials that the conditions of plaintiff's confinement were cruel and unusual or that plaintiff was at risk of being exposed as a former WSP inmate. Rather, the grievances focused solely on a limited and relatively benign issue: the denial of benefits enjoyed by the general prison population. Such deprivations are normal incidents of SHU confinement and are not violations of the Eighth Amendment. See Dixon v. Goord, 224 F. Supp. 2d 739, 748 (S.D.N.Y. 2002). Thus, although plaintiff exhausted grievances at MDC Brooklyn, they do not support a cognizable Eighth Amendment claim.

Therefore, in sum, plaintiff failed to properly grieve cruel and unusual conditions of confinement at both FCI Otisville and MDC Brooklyn, and such failure is not excused. Consequently, we grant the defendants summary judgment on the Eighth Amendment claims.[10]

## II. Personal Involvement

Having granted summary judgment on plaintiff's Eighth Amendment claims, we turn to the remaining Fifth Amendment claims.

The SAC alleges that the defendants violated plaintiff's Fifth Amendment due process rights by "fail[ing] to implement

---

[10] Because we reject the Eighth Amendment claims on this basis, we need not address the defendants' argument that the SAC fails to state a claim under the Eighth Amendment.

and obey adequate procedures for notification of the reasons for SHU detention and periodic review of prisoner SHU status as prescribed in 28 C.F.R. 541." SAC ¶¶ 132, 142. In his opposition brief, plaintiff agreed to voluntarily dismiss his claims against Stephen T'Kach and Joe Norwood, the former director of the Office of Enforcement Operations and the Regional Director of the BOP's Northeast Regional Office, respectively. See Pl. Opp. at 13, n.5. Therefore, we are left with eleven named defendants: the warden at FCI Otisville, Janice Killian; two associate wardens at FCI Otisville, Andrew Dachisen and Frank Lara; four unit managers or counselors who, according to the SAC, only worked with WSP inmates at FCI Otisville, Donna Hill, Teresa Welch, Greg Salitis, and Louis Scialabba; three guards at FCI Otisville, Brian Kessler, Thomas Frost, and Kevin Schrieber; and the warden at MDC Brooklyn, Dudley Terrell. SAC ¶¶ 9-15, 17-20.

The defendants argue that the Fifth Amendment claims against them should be dismissed because their personal involvement is not adequately pled.

A.  Motion to Dismiss Standard

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.

2007); Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998). Nonetheless, "[f]actual allegations must be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation omitted). Ultimately, plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citations omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

B.  Personal Involvement Standard

A plaintiff bringing a Bivens claim must allege that he has been deprived of a constitutional right by a federal agent acting under color of federal authority.  See Bivens, 403 U.S. at 389.  "Because the doctrine of respondeat superior does not apply in Bivens actions, a plaintiff must allege that the individual defendant was personally involved in the constitutional violation."  Thomas v. Ashcroft, 470 F.3d 491, 496 (2d Cir. 2006).  Personal involvement means that the defendant, through his "own individual actions, . . . violated the Constitution."  Iqbal, 556 U.S. at 676.

Until fairly recently, the personal involvement of a supervisory defendant could be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted).

However, in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), the Supreme Court substantially limited the means by which supervisory liability could be established. There, the Court explicitly rejected the argument that supervisors may be held liable for knowing about, and failing to correct, "their subordinates' use of discriminatory criteria to make classification decisions among detainees." <u>Id.</u> at 677. The Court explained that "masters do not answer for the torts of their servants," and "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." <u>Id.</u> While it remains unsettled whether, and to what extent, <u>Iqbal</u> nullified the personal involvement categories articulated in <u>Colon</u>,[11] the case made clear that allegations indicating nothing more than a defendant's passive acquiescence in the misconduct of subordinates are insufficient to establish <u>Bivens</u> liability. <u>See id.</u> at 693 (Souter, J., dissenting) ("Lest there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating <u>Bivens</u> supervisory liability entirely. The

---

[11] The Second Circuit has yet to address the effect of <u>Iqbal</u> on the <u>Colon</u> categories, and courts remain divided on this issue. <u>Compare, e.g.,</u> <u>Bellamy v. Mount Vernon Hosp.</u>, No. 07 Civ. 1801 (SAS), 2009 U.S. Dist. LEXIS 54141, at *27 (S.D.N.Y. June 26, 2009) (holding that "[o]nly the first and part of the third <u>Colon</u> categories pass <u>Iqbal</u>'s muster"), <u>aff'd</u>, 387 F. App'x 55 (2d Cir. 2010), <u>with</u> <u>D'Olimpio v. Crisafi</u>, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (concluding that "the five <u>Colon</u> categories . . . may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated").

nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects.").

C.  The Defendants' Alleged Personal Involvement

The SAC alleges that the defendants were personally involved in the Fifth Amendment violations because they "knew or should have known that [plaintiff] . . . was being denied the process to review his detention in SHU that all inmates in SHU are entitled to, and took no action to remedy the situation."  SAC ¶¶ 88, 125.  As an initial matter, it was not the defendants' duty to review plaintiff's detention in the SHU.  Indeed, according to 28 C.F.R. § 541.26, the Segregation Review Official ("SRO") was responsible for this task.  The SAC itself acknowledges this fact.  See SAC ¶¶ 41, 92 (alleging that John Does No. 1 and 3, the "Segregation Review Officials at [FCI Otisville and MDC Brooklyn], w[ere] responsible for carrying out notice of SHU detention and review of SHU detention procedures"); id. ¶¶ 82, 118 (alleging that John Does No. 1 and 3 "did not conduct those review sessions with [plaintiff] or provide him with any written notice about his confinement status").  Thus, plaintiff has not alleged the defendants' direct involvement in the failure to provide adequate notice and review of his SHU confinement.  See Hicks

v. Podolak, No. 12-cv-00334-RBJ-KMT, 2014 U.S. Dist. LEXIS 59977, at *17 (D. Colo. Apr. 29, 2014) ("[Plaintiff] has not pled facts supporting a claim that Ms. Podolak had any part in the alleged procedural due process violations. Notably, Ms. Podolak was not in a position to administer the SRO review hearings, and [plaintiff] has not alleged that she prevented the hearings from being conducted.").

Accordingly, the only way the defendants could conceivably be held liable is if they were actively involved in a supervisory capacity. Hill, Welch, Salitis, Scialabba, Kessler, Frost, and Schrieber -- unit managers, counselors, and guards at FCI Otisville -- certainly were not. Unlike the other defendants, who are wardens or associate wardens, they are not alleged to have had any supervisory role with respect to the SHU detention review process. Id. ¶¶ 40, 91. Thus, because their personal involvement is not plausibly alleged, the claims against Hill, Welch, Salitis, Scialabba, Kessler, Frost, and Schrieber are dismissed.

With respect to the wardens and associate wardens (Killian, Dachisen, Lara, and Terrell), the SAC alleges that they "were responsible for creating, implementing, and overseeing notice and review policies related to SHU detention." SAC ¶¶ 40, 91. Thus, they are at least alleged to have had some supervisory authority over the review of

plaintiff's confinement.   However, the allegation that they
"knew or should have known" that plaintiff's notice and review
process was defective and failed to correct it "is precisely
the type of claim Iqbal eliminated." Joseph v. Fischer, No. 08
Civ. 2824 (PKC)(AJP), 2009 U.S. Dist. LEXIS 96952, at *43
(S.D.N.Y. Oct. 8, 2009); see also Schweiker v. Chilicky, 487
U.S. 412, 447 (1988) (holding that "in order to prevail in any
Bivens action," a plaintiff "must . . . prove a deliberate
abuse of governmental power rather than mere negligence");
Bellamy, 2009 U.S. Dist. LEXIS 54141, at *28 (plaintiff's
"conclusory allegations that [defendant] must have known about
[plaintiff's] plight [are] not enough to impute . . .
liability"); Walker v. New Jersey, Nos. 12-1734, 12-1829 (PGS),
2012 U.S. Dist. LEXIS 122016, at *11 (D.N.J. Aug. 28, 2012)
("Plaintiff must assert the facts showing each Defendant's
personal involvement in the [allegedly deficient disciplinary
hearing]: the allegation that a defendant 'knew or should have
known about such wrong' are facially insufficient." (emphasis
in original)).

Absent some showing that the wardens and associate wardens
participated directly in the alleged due process violations by,
for example, interfering with the notice and review procedures,
there can be no Bivens liability.  See Steele v. BOP, 355 F.3d
1204, 1214 (10th Cir. 2003) (recognizing that "direct, personal

participation [is] required to establish <u>Bivens</u> liability"),
<u>abrogated on other grounds by</u> <u>Jones v. Bock</u>, 549 U.S. 199
(2007).  Leaving aside that the SAC alleges no specific facts
indicating if or what the wardens and associate wardens
actually knew of the flawed notice and review process, the
SAC's conclusory assertions establish, at most, that they were
merely aware of subordinate nonfeasance.  Such passive conduct
is insufficient to establish personal involvement under <u>Iqbal</u>.

Therefore, because the SAC does not adequately plead the
personal involvement of the wardens and associate wardens
(Killian, Dachisen, Lara, and Terrell), plaintiff's Fifth
Amendment claims against them -- like the claims against the
other defendants -- are dismissed.

### C.  The "John Doe" SROs

The only individuals who are alleged to have directly
participated in the due process violations are John Does 1 and
3, the SROs at FCI Otisville and MDC Brooklyn, respectively.
Although they were responsible "for carrying out notice of SHU
detention and review of SHU detention procedures," SAC ¶¶ 41,
92, they allegedly "did not [conduct] those review sessions
with [plaintiff] or provide him with any written notice about
his confinement status."  <u>Id.</u> ¶¶ 82, 118.  These allegations
are sufficient for purposes of pleading personal involvement.
Therefore, although we dismiss all claims against the named

defendants, we cannot dismiss the case entirely due to the presence of the "John Doe" SROs, against whom plaintiff has stated a viable claim under the Fifth Amendment.

Where, as here, a complaint states a colorable claim against a "John Doe" defendant, the Second Circuit has noted "the appropriateness of maintaining supervisory personnel as defendants . . . until the plaintiff has been afforded an opportunity through at least brief discovery to identify the subordinate officials who have personal liability." Davis v. Kelly, 160 F.3d 917, 921 (2d Cir. 1998); see also Gov't Emples. Ins. Co. v. Hollis Med. Care, P.C., No. 10 Civ. 4341 (ILG)(RML), 2011 U.S. Dist. LEXIS 130721, at *34-35 (E.D.N.Y. Nov. 9, 2011) (noting that "courts in this circuit and others" permit "represented and pro se plaintiffs alike" an opportunity to discover the identities of "John Doe" defendants before dismissing the case); Kearse v. Lincoln Hosp. (Bronx, N.Y.), No. 07 Civ. 4730 (PAC) (JCF), 2009 U.S. Dist. LEXIS 52895, at *4 (S.D.N.Y. June 17, 2009) ("Courts typically refrain from dismissing suits against 'John Doe' defendants 'until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials' . . . ." (quoting Davis, 160 F.3d at 921)).

Consistent with this guidance, we will allow the case to proceed so that plaintiff may engage in limited discovery to

ascertain the identities of John Does 1 and 3. Accordingly, the wardens at FCI Otisville and MDC Brooklyn (Killian and Terrell) shall remain in the case for the sole purpose of enabling this discovery. See Satchell v. Dilworth, 745 F.2d 781, 786 (2d Cir. 1984) ("[Supervisory personnel] may be restored as defendants in the suit . . . for purposes of discovery aimed at identifying those of their subordinates who are personally responsible for the departmental actions complained of."); Rucano v. Koenigsmann, Civ. No. 9:12-CV-0035 (MAD/RFT), 2014 U.S. Dist. LEXIS 44085, at *30 (N.D.N.Y Mar. 3, 2014) (noting that "courts within the Second Circuit have permitted a named defendant who lacked personal involvement in the underlying constitutional violation to remain a defendant solely for the purposes of discovery"); Murphy v. Goord, 445 F. Supp. 2d 261, 267 (W.D.N.Y. 2006) (refusing to dismiss supervisory defendant from action, "[d]espite the paucity of allegations of [his] personal involvement," in order to "allow plaintiff to proceed with discovery to attempt to ascertain the identities of the 'John Doe' defendants"). If plaintiff can obtain the identities of John Does 1 and 3 after a reasonable opportunity for discovery, he may then seek leave to amend the complaint.

## CONCLUSION

For the foregoing reasons, we grant the defendants' motion for summary judgment on the Eighth Amendment claims and their motion to dismiss the Fifth Amendment claims. However, we grant plaintiff leave to conduct discovery in order to ascertain the identities of John Does 1 and 3, and we order defendants Killian and Terrell to remain in the case for the sole purpose of facilitating this discovery.

Dated:   New York, New York
         August 20, 2014

                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Attorneys for Plaintiff**

Douglas F. Broder, Esq.
Marc A. Rogovin, Esq.
K&L Gates LLP
599 Lexington Avenue
New York, NY 10022

**Attorney for Defendants**

James Nicholas Boeving, Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

31